UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NIKITA SMITH,<br><br>Plaintiff,<br><br>v.<br><br>DAVID LEONARD, JR; CITY OF MORGAN CITY; CHAD ADAMS; DOE DEFENDANTS 1-10.<br><br>Defendants. | Case No. 6:24-CV-01192-RRS-CBW |

**MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESS C. SCOTT COURREGE**

Respectfully submitted,

/s/ David Lanser
William Most, 36914
David Lanser, 37764
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
Telephone: (504) 533-4521
Fax: (504) 414-6400
williammost@gmail.com
david.lanser@gmail.com

*Counsel for Plaintiff, Nikita Smith*

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... 2

TABLE OF AUTHORITIES .......... 3

I. Introduction .......... 4

II. Law and Argument .......... 5

III. Courrege's testimony regarding "intent, means, and opportunity" improperly seeks to prove an ultimate issue and is based on incomplete information. .......... 7

IV. Courrege's narrative summary is duplicative of fact-witness testimony and misleads the jury. .......... 11

V. Conclusion .......... 13

# TABLE OF AUTHORITIES

**Cases**

*Bodzin v. City of Dallas*,
768 F.2d 722 (5th Cir. 1985) ........ 6

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........ 5, 6

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997 ........ 5

*Graham v. Connor*,
490 U.S. 386 (1989 ........ 6

*Graham v. Connor*,
490 U.S. 386, 109 S. Ct. 1865 (1989) ........ 6

*Highland Capital Mgmt., L.P. v. Schneider*,
551 F. Supp. 2d 173 (S.D.N.Y. 2008) ........ 11

*Joseph v. Doe*,
2021 U.S. Dist. LEXIS 106081 (E.D. La. June 7, 2021) ........ 4, 6

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ........ 6

*Manton v. Strain*,
No. 09-0339, 2010 U.S. Dist. LEXIS 164716 (E.D. La. Oct. 21, 2010) ........ 6

*Moore v. Ashland Chem. Inc.*,
151 F.3d 269 (5th Cir. 1998) ........ 5

*Moore v. Ashland Chem.,Inc.*,
151 F.3d 269 (5th Cir. 1998) ........ 8

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
200 F.3d 358 (5th Cir. 2000) ........ 5

**Rules**

Fed. R. Evid. 403 ........ 10

Fed. R. Evid. 702 ........ 5, 6

Fed. R. Evid. 702(a) ........ 10

NOW INTO COURT, through undersigned counsel, comes Plaintiff Nikita Smith who files this Memorandum in support of his Motion to Exclude the Testimony of Expert Witness C. Scott Courrege.

## I. Introduction

This case is about a police officer who pepper sprayed a man in the face who did not pose any threat to him or others.

In September 2023, Morgan City Police Department officers and members of several other law enforcement agencies responded to reports of a large crowd gathered in the parking lot of the Circle K and Waffle House in Morgan City, Louisiana, a known gathering area following large events. Testimony is mixed on when, if, and in what manner the crowd was ordered to disperse, but in any event Plaintiff was present merely waiting on the driver of the vehicle he arrived in so they could leave and go to an open convenience store.

At some point, law enforcement handcuffed one individual from the crowd and when leading her away there was a brief interaction between law enforcement and a couple members of the crowd which culminated when Defendant Leonard pushed a woman to the ground. Plaintiff witnessed only this shove and went over to Defendant Leonard to ask him why he would shove a woman. He approached Defendant Leonard and stopped several feet away. Defendant Leonard responded by shoving Plaintiff and then, after he regained his footing, deploying pepper spray directly into his eyes, causing long-term damage. Plaintiff was later issued a warrant for his arrest based upon an investigation which only identified individuals critical of the police on social media, thus violating their First Amendment rights.

Defendants identified C. Scott Courrege as an expert witness in this case on police

procedure and operations. Mr. Courrege is a former law enforcement officer who currently works as an attorney. Part of his professional legal work includes providing legal consult to police officers accused of use of force on a pro bono basis, but he primarily practices as a plaintiffs' attorney for personal injury cases.[1]

As described more fully below, Mr. Courrege's opinion should be excluded in part for two primary reasons. First, Mr. Courrege opines on the ultimate issue of whether Defendant Leonard acted reasonably under the circumstances, which is a determination reserved for the jury. Not only does Mr. Courrege opine on an ultimate issue of law, but he also does so based on a flawed recitation of the facts and improper assumptions regarding Plaintiff's intent which do not adhere to any reliable methodology. Second, a large portion of Mr. Courrege's opinion is a narrative summation that is not only duplicative of other testimony, but also misleads the jury through deceptive presentation of screenshots and handpicked testimony. This portion of Mr. Courrege's opinion adds nothing which would be easily derived by the jury from documentary evidence and witness testimony.

Mr. Courrege's opinion should be excluded, as described herein.

## II. Law and Argument

"Under *Daubert*, courts, as 'gatekeepers,' are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable. The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant."[2]

The district court has considerable discretion to admit or exclude expert testimony under

---

[1] Exhibit B (Deposition of C. Scott Courrege) at 19:13-21:5; Exhibit F (C. Scott Courrege CV).

[2] *Joseph v. Doe*, 2021 U.S. Dist. LEXIS 106081, at *3-4 (E.D. La. June 7, 2021).

Federal Rule of Evidence 702.[3] Rule 702 states that a witness "qualified as an expert by knowledge, skill, experience, training, or education," may provide expert testimony when "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[4] For the testimony to be admissible, Rule 702 establishes the following requirements:

(1) the testimony must be based upon sufficient facts or data,

(2) the testimony must be the product of reliable principles and methods, and

(3) the expert must reliably apply the principles and methods to the facts of the case.[5]

Courts typically analyze these factors via a two-part inquiry. First, the court must determine whether the expert testimony is reliable, which requires an assessment of whether the expert testimony's underlying reasoning or methodology is valid.[6] The court's inquiry into the reliability of expert testimony is flexible and fact-specific.[7] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[8] In analyzing reliability, *Daubert* instructs courts to consider (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[9]

---

[3] See *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[4] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[5] Fed. R. Evid. 702.

[6] *See Daubert*, 509 U.S. at 589 (The party offering the testimony has the burden to establish reliability by a preponderance of the evidence); see also *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*citing In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[7] *Seatrax*, 200 F.3d at 372

[8] See *Daubert*, 509 U.S. at 590.

[9] *Id.* at 592–94. In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, the Supreme Court emphasized that the test of reliability is "flexible" and that Daubert's list of specific factors does not necessarily nor exclusively apply to every expert in

Second, the court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact in understanding the evidence.[10] The second inquiry primarily analyzes whether the expert testimony is relevant.[11]

**III. Courrege's testimony regarding "intent, means, and opportunity" improperly seeks to prove an ultimate issue and is based on incomplete information.**

"The judge is the source of law and the only expert needed by a jury."[12] The Fifth Circuit bars experts from offering ultimate legal conclusions.[13] An expert "must not cross the borderline long recognized by this court between a 'mere explanation of the expert's analysis of the facts; and a 'forbidden opinion on the 'ultimate legal issue' in the case."[14]

Here, the jury will decide whether the force used by Defendant David Leonard, Jr. was objectively reasonable.[15] Courts assess reasonableness through a totality of the circumstances approach and the *Graham* factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[16] Mr. Courrege acknowledges this in his report but then employs a different analytical framework which he says derives from the Peace Officer Standards and Training Council (POST). He says the Louisiana POST analysis is based upon three elements: (1) intent, (2) means, and (3) opportunity.[17]

---

every case. *Kumho Tire*, 526 U.S. at 141. The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

[10] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[11] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[12] *Manton v. Strain*, No. 09-0339, 2010 U.S. Dist. LEXIS 164716, at *4 (E.D. La. Oct. 21, 2010) (quoting *Bodzin v. City of Dallas*, 768 F.2d 722, 725 (5th Cir. 1985)).

[13] *Joseph v. Doe*, No. 17-5051, 2021 U.S. Dist. LEXIS 106081, at *8 (E.D. La. June 7, 2021).

[14] *Joseph v. Doe*, No. 17-5051, 2021 U.S. Dist. LEXIS 106081, at *9 (E.D. La. June 7, 2021).

[15] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[16] *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).

[17] Exhibit A (Expert Report of C. Scoutt Courrege) at 9-10.

Mr. Courrege's opinions on this topic should be excluded for two reasons: (1) because it essentially instructs the jury on the only relevant *Graham* factor, i.e. "whether the suspect poses an immediate threat to the safety of the officers or others," and (2) his analysis of Plaintiff's intent and means is flawed.

Mr. Courrege states in his report that "Louisiana POST and nationally accepted use of force training dictate that an analysis of a person's behavior to determine the potential of a threat to inflict bodily harm,"[18] which mirrors the *Graham* language. The other two *Graham* elements do not apply as the severity of the crime (remaining where forbidden) is low and there is no allegation that Plaintiff evaded arrest or that there was even an attempt to arrest him. The "intent, means, and opportunity" analysis, however, seeks to determine an ultimate issue for the jury – whether Defendant Leonard acted reasonably – and is therefore not appropriate for an expert opinion.

Even if it were allowable to testify to an ultimate issue, Mr. Courrege fails to credibly establish that Plaintiff had either the intent or means to cause Defendant Leonard harm. Mr. Courrege stated at deposition that he inferred Plaintiff's attempt from his "verbal and physical actions."[19] But on several occasions throughout the deposition, Mr. Courrege explained that he could not, in fact, hear what verbal threats Plaintiff allegedly used and was not comfortable putting any of that information in his report as a result:

> Q. What specific words or phrases did you hear Nikita Smith use?
>
> A. It's tough to hear exactly … I specifically didn't quote that in my report, because I wasn't sure of the exact quote … I just didn't want to go down the path of guessing and putting it in a quote.

---

[18] Exhibit A at 10.

[19] Exhibit B (Deposition of C. Scott Courrege) at 93:17-21 ("Q. The intent aspect of this, this is based off of what you described before as far as Nikita Smith's verbal and physical actions? You're inferring intent from that? A. Yes. Correct.")

> Q. So you can tell he is yelling something, but there is no – nothing you are comfortable enough to put in your report? You can't confirm exactly what was said?
>
> A. Yeah. I couldn't make it out.[20]

When pressed further on how in inferred intent to harm, Mr. Courrege testified that it was "[j]ust based on my perception of it. His facial expression, the way he is talking, the way his arms are at his side with his hands in that posture. He is certainly posturing. Whether it's – whatever that is fore, I mean, I don't specifically know what was in his mind, but it's just a factor that we have to look at, because we can't read minds, obviously" (emphasis added).[21]

But an opinion limited to Mr. Courrege's perception lacks the required rigorous testing methodology required to support expert testimony.[22] Mr. Courrege's perception of what either Plaintiff or Defendant Leonard was feeling at the time does not add anything of value beyond what a jury could perceive themselves.

Mr. Courrege also agreed, and video evidence confirms, that regardless of what posturing the Plaintiff may have done he did not advance all the way up to Defendant Leonard and attempt to hurt him, but rather stopped advancing short of Defendant Leonard.[23] Finally, Mr. Courrege apparently did not take into account or put any weight into Plaintiff's declaration of his intent in advancing towards Defendant Leonard, which was just to express his displeasure and ask why he shoved his female cousin to the ground: ("All [Leonard] had to do was get her – he didn't have to,

[20] Ex. B at 66:16-67:10 (see also 63:5-8 "Officer Leonard said he made verbal threats to him, to his safety. I'm not sure of the exact verbiage of that but threats.")
[21] Ex. B at 124:15-24
[22] *Moore v. Ashland Chem.,Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) ("These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.").
[23] See, e.g. Courrege depo 65:22-25 ("Q. He was advancing at one point. He stopped somewhere within this reactionary gap zone, but he stopped advancing at some point, correct? A. Yes. I would agree, yes.").

you know, push her body like he did, you know. And I – I just wanted to ask why – why did you do that. Could you – you could have just, you know, de-escalate the situation, not escalate the situation.")[24] Mr. Courrege's opinion does not assist the trier of fact in assessing Plaintiff's intent and Defendant Leonard's interpretation of the intent, which will require a credibility assessment at trial.

Mr. Courrege also based his analysis of means on incomplete information. One factor of whether Plaintiff had the means to injury Defendant Leonard is Plaintiff's size.[25] But although he confirmed data of Plaintiff's size when evaluating means, he made no effort to determine Defendant Leonard's size:

> Q. We talked about Nikita Smith's size. Do you know what Detective Leonard's height and weight are?
>
> A. No, I'm not sure.
>
> Q. I think you said earlier you have never interacted with him at all, so you never met him in person?
>
> A. Never met him.
>
> Q. Detective Leonard's size, age, and physical condition is not part of your analysis here?
>
> A. It is not.[26]

Further, Mr. Courrege testified that information regarding Plaintiff's history is a factor in evaluating means and specifically stated that an earlier interaction between Plaintiff and officers

---

[24] Exhibit C (Deposition of Nikita Smith) at 35:12-17, 39:20-40:4; Exhibit D (Deposition of David Leonard) at 157:8-11.
[25] Ex. B at 92:22-93:6 ("Q. … Then as far as means, can you just describe that and how that's evaluated? A. Yeah. It's just the person has the physical capabilities to actually harm you in whatever way. You know, physical stature is one of those things that we look at. I think Mr. Smith testified he was 247 pounds or something like that at the time and made a comment about working out in his criminal trial. He is not a little guy.").
[26] Ex. B at 101:16-102:6.

that night would contribute to Defendant Leonard's on-scene assessment.[27] But Defendant Leonard testified that he had no information on Plaintiff's background and did not interact with him or other recognize him from earlier in the incident.[28]

In short, Mr. Courrege's analysis of Plaintiff's intent and means to harm Defendant Leonard – two of three essential elements in assessing whether he posed a threat – are based on incomplete or incorrect information. Because of that and the danger of testifying to an ultimate issue for the jury as the threat is the only relevant *Graham* factor in this case, Mr. Courrege's opinion on intent, means, and opportunity should be excluded.

**IV. Courrege's narrative summary is duplicative of fact-witness testimony and misleads the jury.**

Per Federal Rule of Evidence 702, an expert witness' testimony should be based on "scientific, technical, or other specialized knowledge" and should "help the trier of fact to understand the evidence or to determine a fact at issue."[29] Further, courts may exclude any evidence, whether from expert or lay testimony, that is needlessly cumulative or has the potential to confuse the jury.[30] Here, Mr. Courrege's report includes a factual narrative section which violates both of these rules as the jury is capable of determining facts at issue without the interpretation of an expert.[31]

Defendants offered Mr. Courrege as an expert "in police procedure and operations, including investigations and use of force."[32] In the context of this case, Mr. Courrege has been

[27] Ex. B at 93:6-13 ("When you couple that in with other people in close proximity in a crowd that has shown that its propensity that it is going to intervene – it did in both arrests, including Nikita Smith. *He was face-to-face, nose-to-nose with an officer during the first arrest.*" (emphasis added)).
[28] Exhibit D (Deposition of David Leonard, Jr.) at 128:5-12.
[29] Fed. R. Evid. 702(a).
[30] Fed. R. Evid. 403.
[31] See, e.g., *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 183 (S.D.N.Y. 2008).
[32] Exhibit E (Supplemental Responses to Plaintiff's Second Set of Interrogatories to Defendant City of Morgan City).

called to opine about the use of force by Defendant Leonard on Plaintiff and the subsequent investigations of the incident. Despite this, Mr. Courrege's report includes a section titles "SUMMARY OF EVENTS" which, he purports, "is not an exhaustive recitation of every fact, but merely an overview of the case."[33] In that section, he provides detail on much of the incident at issue that has no relevance to either the use of force or the investigations, including stating details that are disputed and must be determined by the jury.

As discussed, Defendant Leonard stated explicitly at deposition that he did not have any encounter with or knowledge of Plaintiff prior to the use of force.[34] Despite this, Mr. Courrege includes facts from well before the encounter in his summary some of which do not involve Plaintiff at all, including the alleged unruliness of the crowd at the Patterson Civic Center and the efforts to clear the parking in the neighboring town, the arrest of Corvion Smith, and earlier encounter between the crowd (including Plaintiff) and officers.[35] Mr. Courrege provided body camera screenshots of some of these incidents, as well.[36]

Mr. Courrege's summary also includes information that is disputed and even, at times, blatantly incorrect and misleading. For instance, Mr. Courrege includes a body camera screenshot that purports to show that "subjects were slow to depart and many did not comply or attempt to depart, including Nikita Smith."[37] However, Plaintiff testified that although he never received any direct dispersal order, he had been attempting to leave for awhile before the time of this screenshot but could not do so because they were blocked in so was stuck waiting for the chance to safely

[33] Ex. A at 5-9.
[34] Ex. D at 128:5-12.
[35] Ex. A at 5-6.
[36] *Id.*
[37] *Id* at 6.

leave.[38] It is misleading to the jury and prejudicial to the Plaintiff to purport in a summary of facts section that this body camera screenshot is proof that Plaintiff failed to comply with an order.

The facts regarding the encounter include several more handpicked screenshots and leaves out critical information, such as stating that "several males were running toward Detective Leonard, including Nikita Smith," but leaving out the context that he stopped advancing on his own volition before reaching the officers.[39] He also states that Plaintiff "stepped toward Detective Leonard's position" after being shoved without mentioning that Defendant Leonard had also stepped *backwards*, which incorrectly implies that Plaintiff was further closing a gap between them.[40] Mr. Courrege's narrative is also silent on alleged failures of policy by Detective Leonard, including the failure to provide a verbal warning or render aid.[41]

To the extent that any of this evidence is necessary at trial, it is better imparted to the jury through the documentary evidence and testimony from parties, officers, and witnesses who were actually present on scene. Mr. Courrege's narrative is, at best, duplicative of this evidence and in many aspects actively misleads the jury. The testimony should be excluded.

## V. Conclusion

For the reasons discussed in this memorandum, the expert testimony and report of C. Scott Courrege should be excluded.

---

[38] Ex. B at 64:14-65-8.
[39] Ex. A at 7; see also Ex. B at 65:22-25 ("Q. He was advancing at one point. He stopped somewhere within this reactionary gap zone, but he stopped advancing at some point, correct? A. Yes. I would agree, yes.").
[40] Ex. B at 111:11-18 ("Q. But after he got pushed back that first time, he goes back to approximately the same spot, but he doesn't go further toward Detective Leonard, right? A. I can agree with that, yeah. Q. And Detective Leonard actually backed up after pushing him the first time, correct? A. Yes.").
[41] Ex. A at 5-9.

Respectfully submitted,

/s/ *David Lanser*
William Most, 36914
David Lanser, 37764
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
Telephone: (504) 533-4521
Fax: (504) 414-6400
williammost@gmail.com
david.lanser@gmail.com

*Counsel for Plaintiff, Nikita Smith*