UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

**NIKITA SMITH**

**VERSUS**                                                                 **NO. 6:24-cv-01192-RRS-CBW**

**DAVID LEONARD, JR., ET AL.**

<u>**EXPERT REPORT OF C. SCOTT COURREGE**</u>

**I.   INTRODUCTION**

I have prepared the following report regarding the above-captioned matter. I have reviewed the evidence available to me to date, and I have formed opinions that address generally accepted police practices, investigations, and use of force. If additional discovery, information, or evidence becomes available, I reserve the right to amend or supplement my opinions accordingly.

**II.   TABLE OF CONTENTS (FOLLOWING FED. R. CIV. P. 26)**

(i)   A complete statement of my opinions and the basis and reasons for them are set forth in Sections "V" and "VI";
(ii)   The facts and data considered in forming my opinions are set forth in Section "IV";
(iii)   My Curriculum Vitae (CV) is attached to this report as Exhibit "A" and is incorporated herein *in extenso*;
(iv)   My qualifications and publications are set forth in Section "III" and Exhibit "A";
(v)   My testimony within the previous four years is set forth in Section "III.C" and Exhibit "A"; and
(vi)   My fee schedule for this matter is attached as Exhibit "B".

**III.   QUALIFICATIONS**

**A.   PROFESSIONAL EXPERIENCE**

In June 2000, I first became employed in law enforcement with the Harrison County Sheriff's Office in Mississippi as a Community Service Officer and as a Reserve Deputy Sheriff. In July 2001, I transferred to the Gulfport Police Department as a Police Officer. In both roles, I engaged in generalized uniform policing duties that included, but were not limited to, responding to calls for service, writing reports of investigation, conducting follow-up investigations, arresting suspects, performing traffic and pedestrian stops, testifying in court, and initiating proactive patrols.

In May 2003, I was hired by the United States Border Patrol as a Patrol Agent and was assigned to the Brownfield Station in San Diego, California. In this uniformed position, I was tasked with immigration enforcement operations on the United States/Mexico border. My assignments included both fixed checkpoints and roving patrols. I was responsible for detecting and apprehending undocumented immigrants and drug traffickers through traffic stops, bus checks,

and tracking. I later transferred to the San Diego Sector Air Mobile Unit as a Senior Patrol Agent. My job duties shifted to intelligence-driven and specialized proactive enforcement operations, often in high-trafficking areas. I was also temporarily assigned to special duty in Ajo, Arizona.

In January 2006, I was hired by the Drug Enforcement Administration (DEA) as a Special Agent and was assigned to the Sierra Vista Resident Office within the Phoenix, Arizona Field Division. In this plain clothes position, I primarily performed covert federal and state drug investigations. My duties included, but were not limited to, general investigations, physical surveillance, undercover operations, informant management, arresting suspects, drafting and executing search warrants, tactical operations, and utilizing extensive electronic surveillance techniques.

In January 2008, I began a security director position with a diamond cutter in Boca Raton, Florida. As such, I planned and executed covert security operations within the United States, Africa, and Europe. I also coordinated the import and export of diamonds and large sums of currency.

In April 2009, I was hired by the East Baton Rouge Sheriff's Office in Louisiana as a Deputy Sheriff and was ultimately promoted to the rank of Detective-Sergeant. I held positions in Uniform Patrol, Community Policing Unit, Special Community Anti-Crime Team, Narcotics, and Training. In addition to the uniformed policing and narcotics investigator duties mentioned in the above paragraphs, my other duties in these positions included, but were not limited to, supervising narcotics investigations, providing guidance directed to specific operational issues, developing and instructing in-service and academy training courses, policy and procedure drafting, review, and revision, and consulting with office legal counsel on use of force cases.

In January 2022, I founded Courrege Consulting Group, LLC, wherein I offer contract services as a law enforcement expert, consultant, and trainer. I have developed and routinely instruct courses on current legal trends and updates of law, use of force, narcotics investigations, search and seizure, search warrant drafting and execution, stop and frisk, and pursuit liability. Additionally, I have been engaged to review and provide professional opinions regarding policy and procedure, use of force, emergency vehicle operations, pursuits, drug investigations, and search and seizure.

B.   **TRAINING AND CERTIFICATIONS**

In my law enforcement career, I have completed four police academies: (1) Southern Regional Public Safety Institute; (2) Federal Law Enforcement Training Centers, Border Patrol Basic Training; (3) DEA Basic Agent Training; and (4) Capital Area Regional Training Academy. Combined, these academies exceeded 60 weeks of formal training and extensively covered the areas of use of force, defensive tactics, firearms, search and seizure, search warrants, constitutional considerations, emergency vehicle operations, pursuits, specialized investigative techniques, interview and interrogation, and tactical operations.

I have attended over 20 additional training courses, some of which included extensive study of human performance and the effects that stress has on perception and decision-making, particularly in use of force situations (Force Science Analyst and Advanced Specialist

certifications). I have applied this information and training to officer involved shootings in order to evaluate the reasonableness of the shooters' actions and the limitations of human performance during those encounters.

I have been recognized by the Louisiana POST Council as a "Subject Matter Expert" in order to perform instruction and hold certifications as a Federal Law Enforcement Training Centers Use of Force instructor and NHTSA Standardized Field Sobriety Testing (SFST) instructor. I regularly teach law enforcement officers mandatory Louisiana POST curriculum, including Legal Aspects, Use of Force (Integrated Use of Force Management – Response to Resistive Behavior), Operating While Intoxicated (OWI) Investigations, Standardized Field Sobriety Testing (SFST), and Drug ID and Investigations.

### C.  PREVIOUS TESTIMONY AND EXPERT QUALIFICATIONS

In the past four years, I have been qualified and/or accepted as an expert in the following matters: *State of Louisiana v. Johnathan Larue*, 35th JDC (No. 20-727) (testified at criminal trial as defense expert in the areas of general police practices, police training, and use of force); *State of Louisiana v. Travis Clay Depew*, 20th JDC (No. 21-CR-453) (testified at criminal trial as prosecution expert in the areas of general police practices and use of force); and *State of Louisiana v. Byron Franklin*, 24th JDC (No. 22-822) (testified at criminal pre-trial hearing as defense expert in use of force and human factors related to self-defense shootings). I have testified at the Grand Jury for the Parish of Tangipahoa (21st JDC) in *State v. Craig Dunn* as a proffered expert in use of force and human performance factors related to officer-involved shootings. All deposition testimony is noted in my CV Case List.

### D.  FORMAL EDUCATION, PRESENTATIONS, AND PUBLICATIONS

In August 2002, I graduated from the University of Southern Mississippi with a Bachelor of Arts in Criminal Justice and a minor in Forensic Science, with Honors. In December 2017, I received my Juris Doctor from the Southern University Law Center, *Magna Cum Laude*. I am a licensed and practicing attorney in the State of Louisiana and have been admitted since May 2018. Primarily, my law practice at Due' Guidry Piedrahita Andrews Courrege, LC consists of representing plaintiffs in personal injury matters in both federal and state courts. Additionally, I provide *pro bono* legal consultations to law enforcement officers following use of force encounters.

I have presented as a guest speaker and/or Continuing Legal Education (CLE) instructor for the Legal Exposure Mentorship Program (2021 & 2022), Louisiana Nuts & Bolts Judicial Seminar (2021), Louisiana Association for Justice (2020 & 2024), and Louisiana District Attorney's Association (2020 & 2022). I have published a law review article entitled, "Drugged Driving: How the Legalization of Marijuana has Impaired the Ability of the Louisiana DWI Law" in the Southern University Law Review, Vol. 44, Spring 2017, No. 2.

IV.     **FACTS AND DATA CONSIDERED**

I have reviewed and/or utilized the following materials to form a factual basis for my opinions:

1) Complaint;
2) Morgan City PD IA Investigative File (CIRCLE K - IA – 001 – 095);
3) Morgan City PD Criminal Investigative File (CRIMINAL INVESTIGATION – 001 – 120);
4) Morgan City PD Rules and Regulations (POLICIES 001 – 269);
5) Morgan City PD Updated Policies (UPDATED POLICIES 001 – 108);
6) Misdemeanor Trial Transcript;
7) Deposition of Zeke Sampay;
8) Deposition of Dustin Fromenthal;
9) Deposition of Joseph Coleman, Jr.;
10) Deposition of Nikita Smith;
11) Body Worn Cameras;
12) Social Media Video;
13) Dispatch Recorded Calls;
14) Dispatch CAD Reports;
15) Recorded Interviews; and
16) Recorded Telephone Call.

V.     **BASIS FOR OPINIONS**

The opinions expressed in this report are based upon the facts and data as presented in the materials provided to date, which have been identified in Section "IV". I have relied upon my specialized knowledge, experience, education, and training in generally accepted police practices, investigations, and use of force—acquired throughout my law enforcement career, enhanced by ongoing research and education, and applied in my work as a consultant and instructor on these topics.

    A.     **AUTHORITIES**

I have specifically relied upon and reference the following authorities to support my opinions:

1) *Graham v. Connor*, 490 U.S. 386 (1989);
2) La. R.S. 14:63.3;
3) La. R.S. 14:103;
4) Strategic Self-Defense & Gunfighting Tactics, Vanguard Level One Student - Operator Program (2018);
5) Threat Pattern Recognition – Use of Force, Human Factor Research Group, Inc. (2017); and
6) Integrated Use of Force Management – Response to Resistive Behavior (POST).

**B.    SUMMARY OF EVENTS**[1]

On September 2, 2023, a gathering referred to as the "All White" party was held at the Patterson, LA Civic Center.  According to accounts from the officers working security, the event was attended by several hundred people.  After midnight and at the end of the event, the crowd allegedly became "unruly" and officers from Berwick Police Department and Morgan City Police Department responded in an effort to clear the parking lot. Detective David Leonard, Jr. was one of those assisting officers.

Some of the attendees then proceeded to the Waffle House in Morgan City.  An officer was present at the Waffle House working extra duty and began to report a crowd developing in the parking lot.  Officers began to respond to the area. Around 2:33 a.m., Morgan City Police dispatch received a call from the clerk of the Circle K, which is adjacent to the Waffle House.  The clerk advised that the store was closed and there were people in the parking lot throwing things at the windows of the store.

Being close by, officers quickly arrived and began to give verbal orders for the people in the parking lot to disperse since the store was closed.  Some of this was documented on body-worn camera. It can be seen that all twelve gas pumps had a vehicle parked and officers noted that many were not pumping gas. Vehicles were also parked directly in front of the store and along the side of the parking lot nearest McDonald's.

At about 2:37 a.m., officers arrested Corvion Smith directly in front of the store for refusing to leave after being ordered and allegedly causing a verbal disturbance.  As officers were escorting Corvion Smith away from the store, several other subjects, including Nikita Smith, rushed behind officers and began yelling and pointing.  Officers pointed Tasers at and physically stopped the subjects' approach, again, specifically including Nikita Smith:



---

[1] The "Summary of Events" is not an exhaustive recitation of every fact, but merely an overview of the case.

5

Officers continued to attempt to clear the parking lot, but the subjects were slow to depart and many did not comply or attempt to depart, including Nikita Smith, who continued to engage with officers and others near the gas pumps:



Around 2:44 a.m., a group of females can be observed in a verbal argument that began to turn physical.  This led to the detention of a black female.  During this detention, Randasha Grogan can be observed physically interfering with the detention. Detective Leonard observed the activity and ordered officers to arrest Ms. Grogan.  As Officer Aguilar attempted to detain Ms. Grogan, Oniqua Morris began to attempt to pull Ms. Grogan away from the officer's control. In response, Detective Leonard used a single push to move Ms. Morris backwards and away from the arrest:



6



Detective Leonard began to turn and walk behind the officers escorting Ms. Grogan and was charged by another female. Detective Leonard pushed the female away. At the same time, several males were running toward Detective Leonard, including Nikita Smith:



Mr. Smith pointed at Detective Leonard as he approached and balled his fists at his side only feet away:

[SPACE LEFT BLANK]





Detective Leonard, who had drawn his Taser, pushed Mr. Smith backwards. Mr. Smith stumbled several feet backwards, but then again stepped toward Detective Leonard's position and slapped his chest while appearing to be yelling. There were also two other male subjects now pointing at him—all only feet away:



Detective Leonard stated he was giving verbal commands for the subjects to move back, to which they did not comply. At that time, Detective Leonard deployed his OC spray in the direction of Mr. Smith and two other subjects, which caused them to disperse. Officers remained on scene until the crowd fully dispersed. No other arrests were made on scene.

A follow-up investigation was initiated by Detective Joseph Coleman, Jr. Through social media posts and investigative databases, Detective Coleman was able to identify four of the subjects from the parking lot incident, including Mr. Smith. Detective Coleman applied for and received a warrant for Mr. Smith's arrest for remaining after forbidden and disturbing the peace. Mr. Smith was ultimately found guilty after a bench trial.

## VI. OPINIONS AND ANALYSIS

The use of force and subsequent arrest of Nikita Smith has given rise to this litigation. Although numerous other subjects were also arrested and pushed during the parking lot altercation, they are not parties to this suit and the scope of my report is limited to those facts concerning Mr. Smith. Further, my proffered expertise in this case is generally accepted police practices, investigations, and use of force.

### A. THE OPEN HAND PUSH OF AND USE OF OC SPRAY ON NIKITA SMITH WAS CONSISTENT WITH USE OF FORCE TRAINING AND MCPD POLICY & PROCEDURE

Regarding the use of force on Nikita Smith, the question for the jury to decide will be if the force used by Detective Leonard was objectively reasonable per *Graham v. Connor*. It should be noted that it is not my intent to usurp the role of the jury through this expert opinion. However, it is imperative to analyze the use of force using the same *Graham* factors because police officers are trained to use them to evaluate the propriety of any use of force.

As discussed by *Graham* and as taught to all Louisiana police officers in the POST curriculum, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. I have taken careful effort to follow this directive during my expert evaluation of this matter.

Proper application of the *Graham* decision by police officers requires careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Police training also notes that courts also use other factors to aid in the evaluation of the totality of the circumstances, including, but not limited to: the number of suspects and officers involved; the size, age, and physical condition of the officer and suspect; the duration of the action; whether the force applied resulted in injury; previous violent history of the suspect that is known

9

to the officer at the time; the presence of innocent bystanders who could be harmed if force is not used; and the availability of less lethal weapons.

Louisiana POST and nationally accepted use of force training dictate that an analysis of a person's behavior to determine the potential of a threat to inflict bodily harm, great bodily harm, or death to an officer or others is based upon three elements of the person's behavior: (1) intent; (2) means; and (3) opportunity. It should be noted that the threat's behavior must demonstrate all three elements, or cause the officer to perceive all three elements are present to justify the use of force. POST describes the elements as follows:

> Intent – the person must demonstrate their intent to resist being controlled or to inflict bodily harm, great bodily harm, or death to another person. The intent can be demonstrated physically (menacing body language, aggressiveness, violent behavior) or verbally, or in a combination of the two. The physical demonstration of the Threat's willingness to engage in combat can range from subtle challenging body language to overt rage, to include taking a step back (creating distance), blading of the body, or giving the "thousand yard stare."

> Means – the person must have the physical capabilities to carry out the articulated or perceived aggression. The mechanism for inflicting bodily harm, great bodily harm, or death can be through superior size and strength, multiple assailants, superior fighting skills, and/or weapons.

> Opportunity – The person must have access to the officer, another person, and/or the object (weapon) to carry out the articulated or perceived aggression. For example, at the scene of a bar fight, a male subject with clinched fists yells at an officer from across the parking lot that "he will beat the officer senseless" does not have a valid "opportunity" due to his distance from the officer to be able to successfully carry out the threatened violence. Conversely, if the same male subject says he will get his rifle out of his truck and blow the officer's brains out as the subject opens the door to a vehicle, then opportunity does exist.

Even when the decision to use force is warranted or justified, the amount or type of force must also be objectively reasonable based on the totality of the circumstances. Again, it is the role of the jury to decide if the force was excessive, but police officers are specifically trained on when they can and cannot use different types of force.

Applying the *Graham* factors and the other considerations to the facts of this case, as is done in internal use of force investigations and reviews, it is my opinion that the totality of these circumstances supported the decision to use force on Mr. Smith in self-defense and in order to maintain control of the chaotic situation.

Mr. Smith was charged with and found guilty of remaining after forbidden and disturbing the peace—both misdemeanor crimes. However, as noted by the Judge Stansbury, it would be my opinion that Mr. Smith's actions constituted additional crimes, to include obstruction of or interference with an arrest and simple assault of a police officer.

The more salient factor would be the immediacy of the threat presented by Mr. Smith's actions in this particular situation. The parking lot was a tense, uncertain, and rapidly evolving environment that was occupied with a large group people who were blatantly disobeying lawful orders to disperse. When Mr. Corvion Smith was arrested, numerous people began yelling and attempting to interfere with the arrest—including Nikita Smith. Nikita Smith had to be physically pushed backwards by an officer in that moment. The crowd was held at bay at Taser-point but continued to yell and escalate.

When the detention of the female near the vehicle occurred, officers were surrounded and numerous subjects were physically interfering with the arrest. This occurred yet again when Ms. Morris physically interfered with the arrest of Ms. Grogan. At each event, the crowd appeared to become more agitated and displeased with the officers' lawful actions and, yet again, continued to remain in the parking lot after being told to disperse.

Following Ms. Grogan's detention and as the officers were attempting to escort her out of the parking lot, Mr. Smith ran toward Detective Leonard pointing at him and yelling. As Mr. Smith approached within feet of Detective Leonard, he balled his fists as would be expected from and is frequently seen displayed by a person preparing to physically fight. It should be noted that Mr. Smith testified that he was in good shape and weighed approximately 247 pounds at the time.

There were also at least two other male subjects standing within close proximity of Detective Leonard verbally confronting him. Detective Leonard and his fellow officers were backing toward and standing next to gas pumps to their left and the crowd partial encircled them to their right. This physical position was disadvantageous to the officers' safety due to limited ability to move in self-defense, if necessary and added to the threatening nature of the situation.

Facing multiple potential threats, Detective Leonard pushed Mr. Smith backwards and continued to give verbal commands to move back. Detective Leonard was also displaying his Taser, which apparently did not dissuade Mr. Smith from charging forward. It should be noted that the Complaint indicated that the display of the Taser near the gas pump somehow created an unreasonable danger—this is not true. A Taser only sparks once the trigger is deployed, not merely it is displayed. The activation of the light and laser does not create any risk of ignition.[2]

Mr. Smith then again immediately moved toward Detective Leonard while slapping his own chest and yelling. Two other men were also now within feet and pointing at Detective Leonard. Detective Leonard now faced multiple credible threats, who were openly hostile and agitated, and who did not obey orders to back up and disperse. These subjects were within feet of Detective Leonard—creating an opportunity to attack him and his fellow officers—which was an immediate threat to their safety.

---

[2] Based on my training and experience as a Taser instructor, the danger of combustion comes from direct contact of the Taser probes or by dry stun with a flammable liquid due to the direct electrical arch. I have no awareness of gas fumes being ignited by a Taser spark.

11

Finally, as noted, Mr. Smith failed to obey verbal commands to move back and to disperse. Once pushed backwards, he again moved toward Detective Leonard in an aggressive manner potentially making verbal threats. Failing to follow these orders could have been construed as resisting an officer—especially had Detective Leonard decided to make an arrest in the chaotic situation.

In addition to the aforementioned analysis, it also must be determined if the level of force used was necessary to overcome the resistance or in self-defense. To determine if force was necessary, it need be decided whether the force option used created a similar or slightly higher risk of injury compared to the risk of injury created by the subject's actions. Police officers are taught that there is no legal requirement that the force used be the option with the smallest or least risk to the subject so long as the force option was objectively reasonable. Accordingly, there may be many force options that are a reasonable response to the subject's resistance.

To assist with this analysis we look to relevant training, policy/procedure, and generally accepted police practices. Two of the commonly utilized use of force and defensive tactics training programs are known as Human Factor Research Group - Threat Pattern Recognition (formerly PPCT Defensive Tactics) and Strategic Self-Defense & Gunfighting Tactics (SSGT). HFRG and SSGT generally identify levels or types of subject resistance and the corresponding levels of officer response or control. These categories serve to illustrate how certain use of force and defensive tactics are reasonably applied to a subject's resistance, but do not act as a set rule or predetermined response to every situation.

Although the *Graham* Court warned of attempts of mechanical application to review use of force encounters, HFRG and SSGT defensive tactics are generally accepted in police practices and use of force training as reasonable responses to the corresponding levels of resistance. Combining the language and principles from HFRG, SSGT, and other use of force training that I have attended and taught (including Louisiana POST), the levels of non-deadly resistance can be described as passive or verbal non-compliance (static), active or defensive, and aggressive.

Passive or verbal non-compliance (static) consists of a suspect verbally and/or physically refusing to comply with orders. Generally accepted responses include verbal commands and empty-hand control techniques. HFRG specifically designates "soft" empty hand control for this level of resistance, which includes strength techniques, joint locks, and pressure points. All of these techniques are designed to have little or no potential for injury.

Active or defensive resistance consists of physically evading the officer's control by pushing, pulling, bracing, or any other act that would prevent the officer from gaining control, but not an attack on the officer. Generally accepted responses include the aforementioned "soft" empty hand control techniques, and at times, "hard" empty hand control or the use of intermediate weapons when lower forms of control have failed or likely will fail. "Hard" empty hand control techniques allow for strikes. These techniques have a probability of injury in the form of bruises, contusions, or lacerations.

12

Aggressive resistance consists of a physical attack of the officer, but not to the level where the officer will suffer death or serious bodily injury. The attack may consist of the subject advancing, challenging, punching, kicking, grabbing, or wrestling the officer. Generally accepted responses include "hard" empty hand controls and intermediate weapons, which includes the use of chemical agents, impact weapons, and conductive energy weapons.

In my opinion, Mr. Smith's actions created an immediate and credible threat to Detective Leonard's safety. Although not physically resisting an attempted detention, it would be reasonable for an officer to perceive Mr. Smith's behavior as aggressive. Mr. Smith ran at and advanced toward Detective Leonard pointing, yelling, challenging his authority, slapping his chest, and balling his fists. Despite being physically pushed backwards, he again stepped forward in an aggressive and confrontational manner. An officer should perceive this behavior as a physical threat and potential attack.

In response to aggressive behavior, officers are trained that they may use intermediate weapons, such as chemical spray. Notably, Detective Leonard first pushed Mr. Smith backwards—a soft empty hand technique. It was only after a second advance that Detective Leonard utilized his OC spray to create distance between himself and the three threatening subjects.

Accordingly, it is my opinion that Detective Leonard's use of an open hand push and subsequent use of OC spray under these circumstances was consistent with generally accepted police practices and use of force training.

In addition to training and best practices, police officers are guided by agency policy and procedure. Morgan City Police Department Policy # UOF #0001 (UPDATED POLICIES 049) states the following:

**I. PURPOSE**

The Morgan City Police Department's highest priority is safeguarding life, dignity, and liberty of all persons. Officers shall demonstrate this principle in their daily interactions with the community they are sworn to protect and serve. The Morgan City Police Department is committed to accomplishing this mission with respect and minimal reliance on the use of force by using rapport-building communication, crisis intervention, and de-escalation tactics before resorting to force, whenever feasible. This Department builds upon the Supreme Court's broad principles in *Graham v. Conner* (1989) 490 U.S. 386 and may contain components which are more restrictive that the constitutional standard and/or state law. The *Law Enforcement Code of Ethics* requires all sworn law enforcement officers to carry out their duties with courtesy, respect, professionalism, and to never employ unnecessary force. These factors are paramount in maintaining legitimacy with the community and maintaining the public's trust. The purpose of this policy is to provide law enforcement officers with guidelines for the use of less-lethal and deadly force.

## II. POLICY

The decision to use force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight".

In addition, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."

This policy is to be reviewed annually and any questions or concerns should be addressed to the immediate supervisor for clarification. \*\*\*

## IV. LEVELS OF RESISTANCE

**A. Compliant**-Subject offers no resistance
**B. Passive Non-Compliance**-Does not respond to verbal commands but also offers no physical forms of resistance.
**C. Active Resistance**-Physically evasive movements to defeat an officer's attempt to control including bracing, tensing, running away, verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody.
**D. Assaultive**-Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person.
**E. Life Threatening**-Any action likely to result in serious bodily injury or death of the officer or another person.

## V. LEVELS OF FORCE

Officers shall strive to use the minimum amount of force necessary to accomplish their lawful purpose. \*\*\*

## VI. FORCE OPTIONS

The force options authorized by the Morgan City Police Department are physical controls, personal body weapons, chemical agents, control electronic weapon, extended range impact weapons, vehicle interventions, K-9 bites and firearms. These are the force options available to officers, but officers are not required to use the force options based on a continuum. While deploying a particular force option and when feasible, officers shall continually evaluate whether the force option may be discontinued while still achieving the arrest or lawful objective.

**A. TOOLS AND TECHNIQUES**-The following tools and techniques are not in a particular order nor are they all inclusive.

- Verbal Commands/Instructions/Command Presence
- Control holds/Takedowns
- Personal body weapons
- Impact Weapons
- CEW-Control Electronic Weapon (Taser)
- Chemical Agents (Pepper Spray, OC, etc.)
- K-9 Bite
- Vehicle Intervention (Deflection)
- Firearms
- Impact projectile

**B.    PHYSICAL CONTROLS/PERSONAL BODY WEAPONS**-Physical controls, such as control holds, takedowns, strikes with personal body weapons, and other weaponless techniques are designed to gain compliance of and/or control over uncooperative or resistant subjects.

1. When a subject offers some degree of passive or active resistance to a lawful order, in addition to de-escalation techniques and appropriate communication skills, officers may use physical controls consistent with departmental training to gain compliance. A subject's level of resistance and the threat posed by the subject are important factors in determining what type of physical controls or personal body weapons should be used.

2. Officers shall consider the relative size and possible physical capabilities of the subject compared to the size, physical capabilities, skills, and experience of the officer. When faced with a situation that may necessitate the use of physical controls, officers should consider requesting additional resources to the scene prior to making contact, if feasible. Different physical controls involve different levels of force and risk of injury to a subject or to an officer. Some physical controls may actually involve a greater risk of injury or pain to a subject than other force options.

3. PROHIBITED USE OF CHOKE HOLDS-Officers are prohibited from using the following control holds except in an event where lethal force is justified:
a. Carotid restraint
b. Choke Hold-Choking by means of pressure to the subject's trachea or other means that prohibit breathing.

4. Medical Assessment- Any subject who has been injured or complains of an injury in the presence of officers shall be medically assessed by medical personnel.

5. Reporting-The use of physical controls is a reportable use of force when the subject is injured, complains of injury in the presence of officers, or complains of pain that persists beyond the use of a physical control hold. Striking a subject with a personal body weapon is a reportable use of force.

**C. CHEMICAL AGENTS**-Chemical agents, such as Oleoresin (OC) Spray, JPX Pepper, etc. are designed to cause irritation and temporarily incapacitate a subject.

1. Purpose-Chemical agents can be used to subdue an unarmed attacker or to overcome active resistance (unarmed or armed with a weapon other than a firearm: that is likely to result in injury to either the subject or the officer. In many instances, chemical agents can reduce or eliminate the necessity to use other force options to gain compliance, consistent with training and certification authorized by the Morgan City Police Department.

2. Authorized Use-Only those members who have been certified in the use of OC Spray, JPX Pepper, or any other chemical agent issued by the Morgan City Police Department.

3. WARNING-Officers shall provide a verbal warning prior to deploying a chemical weapon if feasible.
a. Announce a warning to the subject and other officers of the intent to deploy the chemical agent if the subject does not comply with officers commands; and
b. Give the subject a reasonable opportunity to voluntarily comply unless it would pose a risk to the public or the officer, or permit the subject to undermine the deployment of the chemical agent.

4. Mandatory First Aid-At the scene or as soon as possible, officers shall administer first aid by:
a. Seating the subject or other person(s) exposed to a chemical agent in an upright position.
b. Flushing his/her eyes out with clean water and ventilate with fresh air.

5. Medical Assessment-Any person exposed to a chemical agent shall be kept under direct visual observation until he/she has been medically assessed. If an exposed person loses consciousness or has difficulty in breathing, an officer shall immediately request for emergency medical personnel, render first aid and monitor the subject until relieved by emergency medical personnel. Officers shall notify dispatch to expedite emergency medical personnel if the person loses consciousness or has difficulty breathing.

6. Transportation- Subject in custody exposed to a chemical agent must be transport in an upright position using a second officer if needed. Hobble cords or similar types of restraints shall only be used to secure a subject's legs together. They shall not be used to connect the subject's legs to his/her waist or hands or to a fixed object.

7. Reporting-Officers shall note on booking form that the subject has been exposed to a chemical agent. If an officer deploys a chemical agent on or near someone, it is a reportable use of force. \*\*\*

In my opinion, the Morgan City Police Department policy and procedure is consistent with generally accepted police practices, policy, and procedure. The policy and procedure incorporates *Graham*, and specifically notes that it is not a force continuum. It defines levels of resistance and levels of officer response, while affording the officer discretion to decide from many options based on the unique facts of the situation.

Further, in my opinion, Detective Leonard's open hand push and use of OC spray was in compliance with the Morgan City Police Department policy and procedure. Mr. Smith's actions would be classified as "assaultive" per this policy and OC spray is authorized. Several verbal commands were given for Mr. Smith to move back and failed to do so. There was ample opportunity for Mr. Smith to comply, yet he continued to aggressively engage with Detective Leonard, making the use of OC spray appropriate per the policy.

**B.   THE INVESTIGATION AND SUBSEQUENT ARREST OF NIKITA SMITH WAS CONSISTENT WITH GENERALLY ACCEPTED POLICE PRACTICES, INVESTIGATIVE TECHNIQUES, AND MCPD POLICY & PROCEDURE**

The timeline of events is instructive in this case regarding the simultaneous, but separate investigations. The incident in question occurred on September 3, 2023. The criminal investigation was initiated September 5, 2023. The IA investigation was initiated on September 6, 2023. Nikita Smith made a formal complaint on September 16, 2023. An arrest warrant was obtained for Mr. Smith on November 28, 2023—at the same time as the three other warrants for Randasha Grogan, Oniqua Morris, and Deontay Jones.

Consistent with generally accepted police practices and investigative techniques, Detective Coleman conducted the criminal investigation and Lieutenant Rick Hartley conducted the IA investigation. Detective Coleman testified that he was not involved with the IA investigation and was unaware of the complaints made by Mr. Smith.

Detective Coleman utilized social media and an open-source database searches to identify the four subjects for whom he later obtained arrest warrants. Detective Coleman stated that he did not identify other subjects in videos that he reviewed. Detective Coleman appears to have reviewed the evidence available to him in an effort to properly conduct a thorough investigation. Detectives are expected to exercise due diligence and not rush through investigations as there is a focus on prosecutable investigations, not quick apprehensions. The fact that warrants were issued in November following a September incident is not out of the ordinary for an investigation involving numerous unidentified potential suspects.

Additionally, Morgan City Police Department investigation policy reflects similar investigative goals and processes that are focused on convictions, not speed of arrests (POLICIES 176):

**Policy**

It shall be the goal of the Criminal Investigations Section to thoroughly investigate each criminal complaint reported for investigation. Investigations shall be conducted in a safe, legal, ethical, and professional manner in order to ascertain the truth with a goal of the apprehension and conviction of criminal violators while protecting the victims of crimes, and to successfully recover stolen property to be returned to it's rightful owner. ***

**Investigative Outlines**

The following shall be the basic procedures used in the investigation of various cases. This list shall not be considered all inclusive, but shall be a guideline for conducting investigations. Detectives are expected to utilize every available legal and ethical resource at their disposal to conclude the investigations which they are assigned.

In every case, the Detective shall:

1. Review the initial report and supplemental reports.
2. If required, contact the initial officer for clarification/additional information.
3. Contact the victim/reporting person, introduce yourself as the Detective assigned.
4. Obtain from victim/reporting person any information not already obtained.
5. Inform the victim/reporting person of the proposed course of the investigation and follow through.
6. Maintain contact with the victim by regular telephone calls while the case is open. ***

In my opinion, Detective Coleman's investigation into this incident was consistent with generally accepted police practices and he utilized appropriate investigative techniques to reach its conclusion. Further, he followed the policy set forth above.

**VII.   CONCLUSION**

After reviewing the facts and data available to me at the time, it is my opinion that Detective Leonard's use of force against Nikita Smith was consistent with use of force training and police policy and procedure. Further, the criminal investigation conducted by Detective Coleman was consistent with generally accepted police practices, investigative techniques, and policy and procedure. If additional discovery, information, or evidence becomes available, I reserve the right to amend or supplement my opinions accordingly.

Respectfully submitted,

/s/C. Scott Courrege
11/19/25