UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

NIKITA SMITH,                         CAUSE NO.

      Plaintiff,     6:24-CV-01192

VERSUS                                RRS-CBW

DAVID LEONARD, JR; CITY OF

MORGAN CITY; CHAD ADAMS; DOE

DEFENDANTS 1-10,

      Defendants.

    DEPOSITION OF C. SCOTT COURREGE, J.D., given in the above-entitled cause, pursuant to the following stipulation, via Zoom videoconferencing, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, on the 15th day of December, 2025, commencing at 10:30 AM.

Page 19

1  Q. What were your duties as a patrolman
2  there?
3  A. Just answering calls for service. I
4  worked in the Gardere area and the Scotlandville
5  area for the sheriff's office.
6  Q. So we didn't miss any law enforcement
7  jobs other than those we just went through, because
8  you've transitioned that from full time to part
9  time as you became an attorney?
10  A. Yeah, correct. So I was there until 2018
11  when I took the bar full time, and then I have
12  remained part time since then.
13  Q. Okay. Great. So getting to your legal
14  practice, how would you describe the type of legal
15  practice that you have?
16  A. We are a personal injury firm, so that's
17  exclusively what we do, plaintiffs.
18  Q. Okay. On your CV here, under your
19  attorney position, the last line here says,
20  "Provide pre-suit legal consultations to law
21  enforcement officers following the use of deadly
22  and non-deadly force." Can you describe how that
23  comes into play?
24  A. Sure. So in our sheriff's offices, as
25  you know, in Louisiana, there is no civil service

Page 64

 1  across the parking lot pointing, and, apparently,
 2  yelling.  You can actually kind of hear it better
 3  in the social media video.  You can hear the
 4  yelling.  So, you know, and apparently verbally
 5  challenging the officer, which he did before during
 6  the first arrest.  So, I mean, this was the second
 7  time he engaged in this behavior that I then saw on
 8  the body camera.
 9       Q.   How does it change your analysis if
10  someone is advancing but then they stop at a
11  certain point?
12       A.   That is too broad.  Give me some better
13  context.
14       Q.   Like in this case, he walks -- would you
15  agree that he advances to a certain point but then
16  stops a few feet before he gets to Leonard?  He
17  doesn't get, you know, right up in his face or
18  anything like that.  He doesn't make physical
19  contact with him.  He advances to a point and then
20  stops.  Is that accurate?
21       A.   Advances to a point.  I mean, whether he
22  is in his face or not, I think we really kind of
23  need a classification or a qualified statement, but
24  I believe he is certainly in Detective Leonard's
25  what we call reactionary gap, which is a six-foot

Page 65

1  gap that we -- six plus foot gap that we try to
2  have to keep people back.  We understand that if
3  someone swings on you or charges you within that
4  confined space, it is very difficult to react
5  timely to defend such an attack.  So, yes, to the
6  extent that he walked and stopped and was not
7  physically stopped, I would agree with the
8  statement.
9      Q.   If someone is advancing and then stops,
10 how does that -- well, let me back up.  Would you
11 agree it's like a constantly evolving analysis
12 whether someone is in this aggressive resistance
13 stance versus active or defensive or whatever? Like
14 that can change throughout an encounter, correct?
15     A.   Yeah.  It can certainly change.  The idea
16 is to keep it in context and evaluate the totality
17 of everything that's happening around to the best
18 of your ability, and, you know, reassess that when
19 it's possible.  Sometimes it's not possible to
20 reassess due to human performance limitations, but,
21 yes.
22     Q.   He was advancing at one point.  He
23 stopped somewhere within this reactionary gap zone,
24 but he stopped advancing at some point, correct?
25     A.   Yes.  I would agree, yes.

Page 66

1    Q.   What is meant by -- I think you sort of
2  got into this a little bit, but what do you mean by
3  challenging in this context?
4    A.   You know, in this case, it appears that
5  Mr. Smith is challenging the officer's authority to
6  use force and then take those other persons into
7  custody.  So, you know, especially then when he
8  reengages as he is slapping his chest, you know,
9  back again, stepping back towards the officer, he
10 is certainly verbally challenging.  You can hear
11 him yelling about putting his hands on him again.
12 So, you know, he is not dispersing, not backing up,
13 as you'd expect someone to do in a crowd setting,
14 so I would consider that challenging the officer's
15 authority in that moment.
16   Q.   What specific words or phrases did you
17 hear Nikita Smith use?
18   A.   It's tough to hear exactly.  It seems
19 like on the -- it seems on the social media post
20 where he is slapping his chest and then stepping
21 back forward that he says something about putting
22 your hands on me again.  Putting your hands on me,
23 you know.  I specifically didn't quote that in my
24 report, because I wasn't sure of the exact quote,
25 and so I think, you know, we can -- that would be

Page 67

```
 1   something to defer to the officer's testimony of
 2   what exactly was said, but certainly you can hear
 3   him screaming and yelling something as he is
 4   approaching back.  I just didn't want to go down
 5   the path of guessing and putting it in a quote.
 6        Q.   So you can tell he is yelling something,
 7   but there is no -- nothing you are comfortable
 8   enough to put in your report?  You can't confirm
 9   exactly what was said?
10        A.   Yeah.  I couldn't make it out.
11        Q.   Okay.  Individuals can express
12   displeasure with police or specific police actions
13   and not be challenged by them, correct?
14        A.   Sure.  That's possible.
15        Q.   That could include yelling and profanity
16   in certain circumstances?
17        A.   Yes.  So, you know, yelling and profanity
18   alone without accompanying the -- without being
19   accompanied by a credible physical threat is often-
20   times protected First Amendment speech, unless it
21   gets into a disorderly type of realm, which we saw
22   here, and what I believe Mr. Smith was ultimately
23   convicted of.  So, you know, it is case-by-case
24   situations, certainly.
25        Q.   Is it ever appropriate to use deadly
```

Page 92

1  you know, obviously, he is well within that 25
2  feet, but like anywhere up to that 25, maybe 30
3  feet, you would say he had the opportunity?
4      A.   Yeah.  It would just really depend on,
5  again, the context.  I mean, if you want to give me
6  a real specific hypo about where everyone else was
7  standing, how they were acting and what they were
8  saying.  So to just say, yeah, 25 feet, I feel good
9  with Nikita Smith in this case is real hard to do.
10 Where is everybody else?  Is everyone 25 feet?  Is
11 everyone calmed down or or they making threats?  So
12 that's why it is so hard to hypo these things
13 without really putting it in the context of the
14 real situation, so.
15     Q.   Can we agree that no matter what the
16 hypo, everything else being the same, anything less
17 than 20 feet you would say he has the opportunity?
18     A.   I would say it would certainly lend
19 towards him having an opportunity with everything
20 else being the same.  I want to be clear that I'm
21 not making some hard-lined arbitrary distance.
22     Q.   That's understood.  Yep.  Then as far as
23 means, can you just describe that and how that's
24 evaluated?
25     A.   Yeah.  It's just the person has the

Page 93

1  physical capabilities to actually harm you in
2  whatever way.  You know, physical stature is one of
3  those things that we look at.  I think Mr. Smith
4  testified he was 247 pounds or something like that
5  at the time and made a comment about working out in
6  his criminal trial.  He is not a little guy.  When
7  you couple that in with other people in close
8  proximity in a crowd that has shown that its
9  propensity that it is going to intervene -- it did
10 in both arrests, including Nikita Smith.  He was
11 face-to-face, nose-to-nose with an officer during
12 the first arrest.  You know, all of that is part of
13 the context.  So am I suddenly going to get jumped
14 by three people swinging at me at once?  I can't
15 defend myself from that, you know, realistically,
16 so it's all part of the threat analysis.
17      Q.   The intent aspect of this, this is based
18 off of what you described before as far as Nikita
19 Smith's verbal and physical actions?  You're
20 inferring intent from that?
21      A.   Yes.  Correct.
22      Q.   Looking back at the policy here under
23 assaultive, attempting to assault the officer is
24 one, you know, one consideration.  What is your
25 understanding of attempting to assault the officer

Page 101

1  context is a consideration, because we saw the
2  interference and the arrest.  We saw the people
3  dragging, you know, Miss Morris, and we saw all of
4  this activity, so that context matters, but when I
5  say the threat was immediate, the immediacy of the
6  threat were these guys in front of him.  The big
7  picture is I would really dissuade an officer to go
8  hands-on and try to take someone to the ground in a
9  context like this, when we saw what happened during
10 the other arrest events, which were only ten
11 minutes before, by the way, or whatever the
12 timeline is.  Yeah, it matters.  It certainly
13 matters, but the threat of, you know, Nikita in the
14 moment, when he was sprayed, was a little more
15 directed to what was going on with his situation.
16      Q.   Then another factor you list at the
17 bottom of this page is size, age, and physical
18 condition of the officer and suspect, correct?
19      A.   Yeah.  That's correct.
20      Q.   We talked about Nikita Smith's size.  Do
21 you know what Detective Leonard's height and weight
22 are?
23      A.   No.  I'm not sure.
24      Q.   I think you said earlier you have never
25 interacted with him at all, so you never met him in

Page 111

1  get a better shot of this. So he sprays and then
2  pushes him, right?
3      A.   Yeah.
4      Q.   And at this point, Nikita Smith, he is
5  back where he was before, actually a little bit
6  behind the gas pump; is that fair?
7      A.   Well, it's hard to tell. He is moving a
8  little bit, so he is in the general area. Maybe
9  within a foot or two in either direction. It's
10 tough to say.
11     Q.   But after he got pushed back that first
12 time, he goes back to approximately the same spot,
13 but he doesn't go further toward Detective Leonard,
14 right?
15     A.   I can agree with that, yeah.
16     Q.   And Detective Leonard actually backed up
17 after pushing him the first time, correct?
18     A.   Yes.
19     Q.   Is there anything between that first
20 moment we looked at and this moment, after he got
21 sprayed, where he displayed assaultive behavior
22 that is different from the other actions you
23 already described?
24     A.   No. I think it falls within the same
25 actions. He is engaging even after being sprayed

Page 124

1  you punch people or about to punch people.  It's
2  just a natural, human posture that people do.
3  People -- you know, just like the Supreme Court
4  says.  Police officers are allowed to rely on human
5  inferences and natural human behavior.  This just
6  happens to be one of those things that people often
7  do in a fighting stance, so it's just something
8  that adds to the factors of the case.
9       Q.   So your testimony is in this screenshot,
10 Nikita is in a fighting stance but not this other
11 individual with his fist balled?
12            MR. DANNA:
13                 Object to the form.
14            THE WITNESS:
15                 Yeah.  Just based on my perception
16            of it.  His facial expression, the way
17            he is talking, the way his arms are at
18            his side with his hands in that
19            posture. He is certainly posturing.
20            Whether it's -- whatever that is for, I
21            mean, I don't specifically know what
22            was in his mind, but it's just a factor
23            that we have to look at, because we
24            can't read minds, obviously.
25 BY MR. LANSER: